IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

DANIEL SCOTT GOOLSBY          )
                              )
v.                            )     No. 2:05-0061
                              )     Judge Wiseman/Brown
JO ANNE B. BARNHART, Commissioner )
of Social Security            )

To:  The Honorable Thomas A. Wiseman, Jr., Senior Judge

**REPORT AND RECOMMENDATION**

        This is a civil action filed pursuant to 42 U.S.C. §
405(g), to obtain judicial review of the final decision of the
Commissioner of Social Security denying plaintiff disability
insurance benefits (DIB) and supplemental security income (SSI),
as provided under Titles II and XVI of the Social Security Act,
as amended.  The case is currently pending on plaintiff's motion
for judgment on the administrative record (Docket Entry No. 16),
to which defendant has responded (Docket Entry No. 25).
Plaintiff has also filed a reply to defendant's response (Docket
Entry No. 26).  For the reasons stated below, the Magistrate
Judge recommends that plaintiff's motion be **GRANTED**, and that the
decision of the Commissioner be **REVERSED** and the cause **REMANDED**
for further administrative proceedings, to include rehearing and
supplementation of the record.

1

# I.  Introduction

Plaintiff filed applications for DIB and SSI alleging
the onset of disability as of April 3, 2000 (Tr. 199-201, 517-
522).  These applications were denied initially, and upon
reconsideration (Tr. 176-186).  Plaintiff subsequently requested
and received a hearing before an Administrative Law Judge (ALJ),
held on July 16, 2003 (Tr. 526-559).  On November 3, 2003, the
ALJ issued a written decision finding plaintiff not disabled (Tr.
51-58).  At plaintiff's request, the Appeals Council granted
review of this ALJ decision, and by order of March 3, 2004,
remanded the matter to the ALJ level for further development and
a new decision (Tr. 62-64).

On September 27, 2004, a new hearing was held before a
different ALJ (Tr. 560-571).  Upon consideration of the entire
record of administrative proceedings, the ALJ issued a written
decision on February 17, 2005, denying plaintiff's applications
for benefits (Tr. 13-23).  The ALJ made the following findings:

1.   The claimant meets the nondisability requirements for a
     period of disability and Disability Insurance Benefits
     set forth in Section 216(i) of the Social Security Act
     and is insured for benefits through the date of this
     decision.

2.   The claimant has not engaged in substantial gainful
     activity since the alleged onset of disability.

3.   The claimant's anxiety, personality, and depressive
     disorders are considered "severe" based on the
     requirements in the Regulations 20 CFR §§ 404.1520(c)
     and 416.920(b).

2

4.  These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4. The claimant's mental impairments impose no more than mild restriction of activities of daily living, and no more than moderate limitations of social functioning or ability to sustain concentration, persistence, or pace. He has had no extended episodes of mental decompensation, and he functions adequately outside of a highly supporting setting.

5.  The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

6.  The claimant has the following residual functional capacity: to lift and carry 50 pounds occasionally and 25 pounds frequently, and to sit or stand/walk each for as many as 6 of 8 hours. He can perform simple and low-level detailed tasks, can persist through a work week adequately and maintain work schedules, and can adapt to routine changes and relate adequately to peers and supervisors, but should not work around the general public.

7.  The claimant is unable to perform any of his past relevant work (20 CFR §§ 404.1565 and 416.965).

8.  The claimant is a "younger individual between the ages of 18 and 44" (20 CFR §§ 404.1563 and 416.963).

9.  The claimant has a "high school (or high school equivalent) education" (20 CFR §§ 404.1564 and 416.964).

10. The claimant has no transferable skills from any past relevant work and/or transferability of skills is not an issue in this case (20 CFR §§ 404.1568 and 416.986).

11. The claimant has the residual functional capacity to perform a significant range of medium work (20 CFR §§ 404.1567 and 416.967).

12. Although the claimant's exertional limitations do not allow him to perform the full range of medium work, using Medical-Vocational Rule 203.29 as a framework for decision-making, there are a significant number of jobs in the national economy that he could perform.

3

Examples of such jobs appear in the body of this
decision.

13. The claimant was not under a "disability," as defined
in the Social Security Act, at any time through the
date of this decision (20 CFR §§ 404.1520(f) and
416.920(f)).

(Tr. 22-23).

On May 18, 2005, the Appeals Council denied plaintiff's
request for review of the decision of the ALJ (Tr. 7-9), thereby
rendering that decision the final decision of the Commissioner.
This civil action was thereafter timely filed, and the Court has
jurisdiction. 42 U.S.C. § 405(g). If the Commissioner's
findings are supported by substantial evidence, based on the
record as a whole, then these findings are conclusive. Id.

## II. Review of the Record[1]

### A. Plaintiff's Work History

Between July 1987 and October 1991, plaintiff worked as
a meat cutter. From January 22, 1992 until September 1993, he
worked as a machine operator in a local factory. Between April
1994 and May 1998 he worked as a machine operator and a retail
store clerk in a grocery store. In 1999 he worked as a cook and
dishwasher in a restaurant. Between October 1999 and April 2001

---

[1]This summary is taken from plaintiff's memorandum in support of his
motion for judgment on the administrative record. (Docket Entry No. 15, pp.
3-11). Defendant has not opposed this rendition of the facts.

4

he worked as a machine operator for Dacco earning $10.70 per hour (Tr. 17).

 While his disability application was pending, plaintiff performed both full time and part time work (Tr. 17-18). He worked as a dietary aide in a nursing home and full time as a stocker at Wal-Mart. He also had the wherewithal to attend school part-time during this time. The ALJ found that his work during 2001 through April 2004 was not substantial gainful activity, and therefore, determined that he did not work during that time. In April 2004 Wal-Mart fired plaintiff for excessive absenteeism. The ALJ also determined that he cannot return to any of his previous work (Tr. 22).

 B.  Plaintiff's Longitudinal Medical History

 Plaintiff was born on September 28, 1968 in Cookeville, Tennessee. He was a normal child with good intelligence but witnessed some "bizarre" occurrences and events. As a youngster he saw his father beat his mother, his siblings and himself. When his parents divorced, plaintiff was required to spend time with his abusive father which caused him additional trauma and grief. His first bout with mental illness manifested itself during this time. Because he had to endure a considerable amount of stress in his life, his grades suffered and his behavior became unmanageable. He burned his sister with cigarettes, raised his fist to confront his mother, and discovered a painless

5

way of plucking out his eyelashes. On February 6, 1981, Dr. Georgia Abisellan admitted plaintiff to the Donelson Hospital and treated him for depression (Tr. 302-305).

Plaintiff's medical history is well documented and his treatment prior to his application for benefits will only be highlighted here. On May 31, 1993, plaintiff was hospitalized at McFarland Psychiatric Facility in Lebanon, Tennessee for an extensive history of chemical dependence. While at McFarland, a team of physicians prescribed Zoloft and other medication. Plaintiff expressed suicidal ideation and had cut his wrists (Tr. 306-308). Between March 17, 1994 and April 5, 1994 he was again hospitalized for major depression and substance abuse (Tr. 309-311). On June 15, 1994, Dr. Wisam Owais administered a psychiatric evaluation to plaintiff. Dr. Owais diagnosed a bipolar disorder and prescribed a number of medications (Tr. 504-506). On May 13, 1994 he was diagnosed with a panic attack and agoraphobia (Tr. 508-511). On September 15, 1997 Dr. Steven Nyquist admitted plaintiff to Summit Medical Center in Hermitage, Tennessee for major depression, crisis intervention, diagnostic evaluation and treatment (Tr. 322-327). Dr. Abisellan admitted plaintiff to Summit Medical Center again on October 23, 1997 for major depression and suicidal ideation (Tr. 328-330). On February 17, 1998 and again on May 15, 1998 he was admitted again for psychiatric treatment to Summit Medical Center for major

6

depression (Tr. 334-342).

Plaintiff's most recent medical history can be divided
into three phases. Even before he applied for disability
insurance benefits, plaintiff was an outpatient at the Volunteer
Behavioral Health Care System (VBHCS). Here he received
counseling and support from the case managers at that facility
and prescription refills by Dr. J.T. DeBerry, a staff physician.
In addition, he was hospitalized as an inpatient in June 2002 and
was treated by Dr. Ana Maria Sarasti, a psychiatrist with the
Rivergate Psychiatric Center in Goodlettsville, Tennessee.
Finally, he was treated by Dr. Pushpendra K. Jain and other
members of the medical staff at Cookeville Medical Center.
Between July 23, 2003 and August 13, 2004, plaintiff visited that
facility on 47 occasions, with complaints that ranged from severe
orthopedic complaints to mental impairments (Tr. 73-175).

On February 20, 2000, plaintiff talked with his case
manager at Volunteer Behavioral Health Care System and reported
being very upset about the changes in his employment setting (Tr.
501). On March 14, 2000, he again talked with his case manager
and expressed concern about being dismissed from his employment
and that his wife was expecting a child (Tr. 498). On March 30,
2000, a VBHCS case manager visited plaintiff in his home and
reported that he had expressed satisfaction with his medication.
During all his treatment at VBHCS, plaintiff had presented

7

symptoms of anxiety, panic attack, agoraphobia and other mental disorders (Tr. 465-467).

On May 4, 2001, plaintiff was again treated at VBHCS. His case manager reported that he seemed stable at the time of his visit, however, he seemed bored because of his lack of work. He continued to take his medication and did not report any suicidal ideation. On May 21, 2001, his condition had not changed any and he expressed hope of being called back to work (Tr. 484).

On May 30, 2001, he again consulted the medical staff at VBHCS and asked for assistance from the case manager about how he could receive unemployment while maintaining part time employment at Masters Health Care Center. The case manager tried to help him obtain benefits and part time employment. On June 7, 2001, his condition was unchanged, as he continued to take his prescription medication and was resting well (Tr. 483).

He maintained his periodic treatment at VBHCS on June 18, 2001 and June 25, 2001 (Tr. 481).

When plaintiff was treated at VBHCS on September 28, 2001, he reported that he started to school under the auspices of the Tennessee Department of Vocational Rehabilitation and was also trying to work part time as a kitchen aide at Masters Health Care Center. He stated that he was "overwhelmed" by his work and school, and did not know whether he could maintain the discipline

8

to continue (Tr. 476).

In October 2001, plaintiff experienced aggravation of his symptoms of depressive disorder, panic disorder, agoraphobia, sleep and appetite disturbance, depressed mood, suicidal ideations, crying spells, and loss of self esteem (Tr. 467). His treating physician, Dr. DeBerry, determined his current global assessment of functioning (GAF) at "65" and noted that his highest GAF had been "70" in the past year, and his lowest GAF had been "40" in the past year. While a patient at that VBHCS, plaintiff did appear to resolve his polysubstance dependance issues (Tr. 469).

The record also contains a "Tennessee Clinically Related Group Form", which was apparently produced by VBHCS for TennCare. On October 25, 2001, the medical staff at VBHCS assessed plaintiff's functional limitations. At that time, he had frequent problems with daily activities and completing them, little association with society, and used only family and mental agency for support. He experienced moderate limitations in concentration, task performance, and pace, and was unable to complete a task due to the lack of concentration. He also experienced moderate difficulties in his ability to adapt to change, which caused him paranoia and anxiety. This assessment concluded that plaintiff had severe and persistent mental illness and that the duration of the severity totaled six months or

9

longer for the past year (Tr. 472-474).

On December 11, 2001, plaintiff's case manager visited him at his home. Plaintiff was quiet and reserved that day, and stated that he and his wife had been having difficulties. He stated that his wife had complained that he had not been back to work. He also stated that he did poorly on a math test, and had actually discovered that he had been attending the wrong math class. Although he appeared depressed, plaintiff denied any suicidal ideation (Tr. 463).

On August 14, 2001, plaintiff was evaluated by Gerrell F. Killian, a licensed psychological examiner at the request of the Tennessee Department of Vocational Rehabilitation Services. Mr. Killian observed that plaintiff was a "husky" young man at approximately 5'11" tall and 225 pounds. Plaintiff reported that he had gained about 50 pounds over the past few years which he believed to have partially resulted from medication. Mr. Killian also stated that his primary problems had been panic attacks and depression, and noted that he continued to have two panic attacks per week, and that the medication made him sluggish. Administration of the Wechsler Adult Intelligence Scale-Third Edition (WAIS-3) and Rorschach Ink Blot Test yielded a verbal IQ of "104", a performance IQ of "89", and a full scale IQ of "98". He produced 24 precepts to the 10 Rorschach Ink Blots which was considered to be low-average in an individual of plaintiff's

10

intellectual functioning.  The psychological examiner also stated that there were indications of considerable hostility, which he indicated was the result of his childhood as well as current circumstances.  Plaintiff indicated problems of panic attacks, which included rapid heartbeat, profuse sweating, dizziness and passing out and a very high level of a non-specific fear.  Mr. Killian also reported difficulty concentrating, problems with sleep and that he also had suicidal thinking (Tr. 345-348).

In June 2002, plaintiff was hospitalized as a psychiatric inpatient at Summit Medical Center.  Dr. Ana Maria Sarasti diagnosed his condition as a schizo affective disorder, generalized anxiety disorder, and post traumatic stress disorder. When he was released from Summit, plaintiff was prescribed the following medications: Doxepine (150 mg), taken once at bedtime; Effexor (75 mg) twice daily; Seroquel (200 mg) twice daily; Klonopin (2 mg) three times daily; Haldol (10 mg) once at bedtime; Cogentin (1 mg) once at bedtime; Verapamil (240 mg) once daily; and Nicobid (500 mg) twice daily (Tr. 300-301, 515-516).

On July 12, 2002, plaintiff was discharged from Summit. Dr. Sarasti noted that he had difficulty sleeping, that he had recently filed for divorce from his wife, and that his suicidal thoughts and psychosis seemed to be lessened (Tr. 300).

On August 9, 2002, September 9, 2002, and October 7, 2002 Dr. Sarasti saw plaintiff on a regular monthly basis.  On

11

October 21, 2002, she summarized his progress and noted that since his discharge from Summit his condition remained chronic, but he had some improvement in his ability to control some of his depressive symptoms and was no longer experiencing suicidal thoughts. On the other hand, there were only slight improvements in his level of concentration and Dr. Sarasti reasoned that he lacked the ability to organize ideas in a way that would allow him to be gainfully employed (Tr. 515-516). Dr. Sarasti saw plaintiff on two occasions in November 2002 and noted that his anxiety level had increased (Tr. 515). Between December 10, 2002 and June 30, 2003, Dr. Sarasti saw plaintiff ten times. On June 30, 2003, she discussed his improvement in symptoms related to his delusional thinking and chronic suicidal thoughts, but also believed that anxiety continued to be a limiting factor in his ability to maintain any gainful employment. Side effects from medication included sedation that would further limit his ability to deal with situations that require concentration and potential for injury. It is significant that Dr. Sarasti believed that his symptoms of depression and paranoia would worsen under minimal stressful circumstances (Tr. 300).

On July 12, 2004, Dr. Sarasti submitted a mental impairment questionnaire regarding plaintiff's current level of functioning. She stated that he had appetite disturbance, sleep disturbance, personality change (paranoia), mood disturbance,

recurrent panic attacks, anhedonia, difficulty concentrating, suicidal ideations and attempts, decreased energy and obsessions or compulsions. She assessed his current GAF at "37-41_ (Tr. 70). She observed that plaintiff had extreme difficulties in social functioning, constant deficiencies of concentration, persistence or pace resulting in failure to complete tasks in timely manners, and continual episodes of decompensation or deterioration in work or work-like settings (Tr. 72).

On July 24, 2003, he was seen by physicians at Cookeville Medical Center for the complaint of depression. Plaintiff stated that he had suffered from depression for the past nine years, and had difficulty sleeping, lack of energy, marital difficulties and that he had suicidal attempts and thoughts. At that time his weight was 199 pounds (Tr. 137). On August 13, 2003, he was a patient at Cookeville Medical Center complaining of orthopedic pain and anxiety. On October 1, 2003, he was again treated for complaints of anxiety and his symptoms had been characterized by appetite loss and sweating. He appeared stressed out, reported changes in sleep pattern and had depression and insomnia (Tr. 123). On October 9, 2003, he was again treated at Cookeville Medical Center for post traumatic stress disorder and migraine headaches. His weight had dropped to 193 pounds (Tr. 116-118). On October 24, 2003, he was again a patient at Cookeville Medical Center complaining of anxiety, and

13

shoulder pain (Tr. 111). On November 12, 2003, he was again treated for anxiety at Cookeville Medical Center (Tr. 104).

On December 15, 2003, he was again treated for symptoms associated with anxiety, chronic pain, irregular hours of sleep, lack of concentration and loss of appetite. And on that day his weight was listed at 188 pounds (Tr. 100).

On January 21, 2004, he went to Cookeville Medical Center with complaints of severe headache, extreme nervousness and vomiting. His weight was listed at 175 pounds (Tr. 94). On February 13, 2004, he was seen at the Cookeville Medical Center for back pain (Tr. 91). On May 25, 2004, he presented complaints of a rotator cuff injury to Cookeville Medical Center. His weight at that time was listed at 158 pounds (Tr. 82). On August 13, 2004, he was treated again at Cookeville Medical Center with complaints of nervousness and his medication was refilled. His weight at that time was 157 pounds (Tr. 74).

### III.  Conclusions of Law

#### A.  Standard of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. Jones v. Secretary, 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's

14

decision, and (2) whether any legal errors were committed in the process of reaching that decision. Landsaw v. Secretary, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." Her v. Commissioner, 203 F.3d 388, 389 (6th Cir. 1999)(citing Richardson v. Perales, 402 U.S. 389, 401 (1971)). It has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." Bell v. Commissioner, 105 F.3d 244, 245 (6th Cir. 1996). Even if the evidence could also support a different conclusion, the decision of the ALJ must stand if substantial evidence supports the conclusion reached. Her, 203 F.3d at 389 (citing Key v. Callahan, 109 F.3d 270, 273 (6th Cir. 1997)). However, if the record was not considered as a whole, the Commissioner's conclusion is undermined. Hurst v. Secretary, 753 F.2d 517, 519 (6th Cir. 1985).

B.  Proceedings at the Administrative Level

The claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). At the administrative level

15

of review, the claimant's case is considered under a five-step sequential evaluation process, as follows:

(1) If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.
(2) If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.
(3) If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[2] or its equivalent; if a listing is met or equaled, benefits are owing without further inquiry.
(4) If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (e.g., what the claimant can still do despite his or her limitations); by showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a prima facie case of disability.
(5) Once the claimant establishes a prima facie case of disability, it becomes the Commissioner's burden to establish the claimant's ability to work by proving the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

Moon v. Sullivan, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be carried by relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid

---

[2] The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, Appendix 1.

16

rule. Otherwise, the grid can not be used to direct a conclusion, but only as a guide to the disability determination. Id. In such cases where the grids do not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's prima facie case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert (VE) testimony. See Varley v. Secretary, 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity (RFC) for purposes of the analysis required at steps four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. See 42 U.S.C. § 423(d)(2)(B).

C. Plaintiff's Statement of Errors

Plaintiff argues that the ALJ erred in rejecting the opinion of his treating psychiatrist, Dr. Sarasti, in favor of the opinion of an earlier treating mental health professional, Dr. DeBerry, since the former treated plaintiff from mid-2002 through 2004, while the latter treated plaintiff during 2000-2001. These sources did not treat plaintiff concurrently, and plaintiff argues that his condition worsened in mid-2002. Plaintiff further argues that the ALJ failed to consider Dr.

17

Sarasti's statement as to the sedative side effects of his medications. As explained below, the undersigned concludes that further administrative development of these issues is warranted. Plaintiff's remaining allegations of error, related to § 12.04 of the Listing of Impairments and the ALJ's hypothetical questioning of the VE, depend on the further clarification of his mental condition upon a fully developed record, and so will not be addressed here.

Defendant states that all charged errors rely on the proposition that Dr. Sarasti's assessment should have been credited, and that the ALJ's proper rejection of that assessment renders his decision substantially supported. This is to some extent an oversimplification, but as a matter of compliance with the regulatory prescription of deference to treating sources, and the requirement that good reasons be given to support the rejection of a treating source's opinion (enforced by the Sixth Circuit's decision in Wilson v. Comm'r of Soc. Sec., 378 F.3d 541 (6th Cir. 2004)), the undersigned would agree that the failure of Dr. Sarasti to document observations and findings supportive of her restrictive assessment justified the ALJ's rejection of that assessment. Moreover, between plaintiff's past work attempts, his part-time return to school, and his efforts to obtain unemployment compensation in 2001 and years prior, there clearly were adequate grounds for the ALJ's decision to discount

18

plaintiff's credibility, at least insofar as plaintiff alleged total disability beginning in April 2000.

However, the 2004 assessment of Dr. Sarasti, unsupported though it may be, also appears to be uncontradicted by any medical evidence since the February 2002 assessment of a non-examining state agency source. This is significant in light of (1) plaintiff's argument that his condition significantly deteriorated in mid-2002, when his marital problems and joblessness contributed to his two-week in-patient psychiatric hospitalization at Summit Medical Center, and (2) the Appeals Council's explicit instruction to the ALJ to complete the record by obtaining additional evidence in the form of consultative examinations,[3] if warranted and available (Tr. 63). While the ALJ apparently concluded that the purchasing of further examination reports was unwarranted, the undersigned cannot agree. As mentioned, the opinion of Dr. Sarasti, while not corroborated by any contemporaneous evidence, is also not contradicted by the other evidence post-dating February 2002, namely the records from Cookeville Medical Center, where plaintiff presented with complaints of depression and anxiety

_____

[3]There is a report of a consulting examiner in the record (Tr. 345-48), which generally reflects the higher level of functioning described by Dr. DeBerry. However, this consultant's report, which was purchased to assess his candidacy for vocational rehabilitation rather than his eligibility for disability benefits, is based on a clinical interview and psychological testing performed in August 2001, well before the alleged deterioration in plaintiff's condition.

19

even during his treatment by Dr. Sarasti (Tr. 74, 94, 100, 104, 111, 116-18, 123, 137).

It appears as though the ALJ concluded that further, more contemporaneous development of the medical record was not warranted because plaintiff was noted to have "attended Tennessee Tech in June 2003, worked in a restaurant in May 2003, and to have worked at Opryland in March 2003," and because plaintiff had declined to continue his therapy visits as of the time of the hearing (Tr. 19). However, these brief, unsuccessful attempts to work as a dishwasher (Tr. 531, 534), the short time attending school, and the questionable decision to hold a mentally ill person accountable for poor judgment in discontinuing therapy, Blankenship v. Bowen, 874 F.2d 1116, 1124 (6th Cir. 1989), do not bridge the gap between the body of medical evidence credited by the ALJ -- which speaks to plaintiff's condition in 2001 and early 2002 -- and the ALJ's decision in 2005.

Indeed, both plaintiff and his ex-wife (whose testimony was not discredited or even referenced by either ALJ) testified at the first administrative hearing that these attempts at dishwashing work, as well as other work attempts, were unsuccessful because when plaintiff was stable due to full compliance with his psychiatric medications, he was slowed by their sedative side effects (Tr. 535-36, 538-39, 553, 555-56). Plaintiff again testified to such side effects at his

20

supplemental hearing (Tr. 565).[4] These sedative side effects were also referenced in a June 2003 letter from Dr. Sarasti (Tr. 300), and in her 2004 assessment (Tr. 71). However, despite explicit instructions from the Appeals Council in its remand order to evaluate such factors in the consideration of plaintiff's subjective complaints (Tr. 62-63), the ALJ failed to expressly consider these medication side effects. Defendant argues that the fact that plaintiff was noted by Dr. Sarasti to be "stable" on his medications indicates that he was able to work, but this again does not account for the limiting side effects of these medications, which were never mentioned in the ALJ's decision. Curiously, defendant also argues that, in light of plaintiff's report of his joblessness contributing to his depression, "[e]very indication remains that Mr. Goolsby would be less sad if he went out and worked." (Docket Entry No. 25, p. 10). Defendant even goes so far as to suggest that this sentiment is shared by Dr. Sarasti, who was described as "seem[ing] to quietly say the same thing" by her indication of plaintiff's apparent intellectual ability to work full time versus his actual performance level. (Id.). The undersigned finds these remarks to be more than a bit disingenuous, and again

[4]The undersigned must note that the transcript of this supplemental hearing is not particularly helpful. In addition to the fact that plaintiff's non-attorney representative did not even examine him, deferring instead to the ALJ who examined him only briefly, the transcript lacks much in the way of probative value because half of plaintiff's testimony, and even some of the ALJ's questioning, was inaudible and thus unable to be transcribed.

finds fault with defendant's failure to account for medication side effects.

In sum, plaintiff has a long history of mental illness, with the first of several in-patient psychiatric hospitalizations occurring when he was twelve years old (Tr. 302-05), and several references in the record to past suicide attempts or instances of suicidal or homicidal ideation. He is taking multiple psychiatric medications to control his symptoms of depression and anxiety. His treating psychiatrist has assessed him as having totally disabling limitations, assigning a Global Assessment of Functioning (GAF) score of 35-41 (Tr. 70-72). Even Dr. DeBerry noted in October 2001 that at one point during the prior year of treatment, plaintiff's GAF score had been as low as 40 (Tr. 469). Plaintiff experienced a weight loss of over 40 pounds between July 2003 and May 2004, which Dr. Sarasti appears to attribute to impairment-related appetite disturbance (Tr. 70). Even considering a reduced level of deference owed Dr. Sarasti's assessment on account of its being uncorroborated, without any contrary evidence relating to the period post-2002, the ALJ's decision cannot stand.

Accordingly, the undersigned concludes that further administrative proceedings must be had, including (1) supplementation of the medical record by request to plaintiff's treating sources and, if necessary, a consultant hired by the

government, (2) rehearing, and (3) the rendering of a new decision upon the updated record.

### IV. Recommendation

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion for judgment on the administrative record be **GRANTED**, and that the decision of the Commissioner be **REVERSED** and the cause **REMANDED** for further administrative proceedings as described herein.

Any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have ten (10) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. Thomas v. Arn, 474 U.S. 140 (1985); Cowherd v. Million, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

**ENTERED** this 26th day of June, 2006.

/s/ Joe B. Brown
JOE B. BROWN
United States Magistrate Judge

23